UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BROW ART MANAGEMENT, LLC,

      Plaintiff,

                                    Civil Case No. 23-11434

v.                                   Honorable Linda V. Parker

IDOL EYES FRANCHISE, LLC *et al.*,

      Defendants.

_____/

## AMENDED OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This is a diversity action arising from former employees purported breaches of restrictive covenants in their employment contracts with Plaintiff regarding eyebrow threading services. Plaintiff also seeks relief against the former employees' new employer for alleged torts regarding the same contracts. The matter is presently before the Court on "Plaintiff's Ex-Parte Motion for Temporary Restraining Order and Preliminary Injunction." (ECF No. 3.) The motion is fully briefed, ECF Nos. 7, 10, and on July 11, 2023, the Court held a hearing on the present motion. For the following reasons, the Court grants the motion in part and enters preliminary injunction.

## BACKGROUND & PROCEDURAL HISTORY

Plaintiff Brow Art Management, LLC, ("Plaintiff") is a direct provider and franchisor of beauty and skincare services, including eyebrow threading.  Plaintiff also maintains a uniform business model, which uses specially designed operations and equipment.  Defendants Anas Sullaka, Lina Hirmuz, and Manal Hassan ( collectively, "Defendant Employees") were employed by Plaintiff as Eyebrow Threaders.

### Nondisclosure/Non-Competition Agreements

In 2011, Defendant Hassan executed a nondisclosure and non-competition agreement with Perfect Brow Florida, Inc. ("PBF"), when she was originally hired by PBF.  (Hassan Agreement, Ex. 1, ECF No. 1-1.)  The same year, Defendant Hirmuz executed a similar agreement with PBF to work as an Eyebrow Threader. (Hirmuz Agreement, Ex. 2, ECF No. 1-2.)  On June 23, 2015, Defendant Sullaka executed a nondisclosure and non-competition agreement with Perfect Brow Art, Inc. ("PBA") in connection with her employment as an Eyebrow Threader. (Sullaka Agreement, Ex. 3, ECF No. 1-3.)  PBF and PBA also conducted business under the name "Brow Art 23."

Paragraph 1 of the Agreements with Defendant Employees, titled "Trade Secrets and Confidential Information," states, in relevant part:

> a)   In this Agreement, "Trade Secret" is information related to or used in Brow Art 23's business or

2

operation and that is not commonly known by or available to the public. The information covers but is not limited to techniques, technical or non-technical data, formulas, patters, compilations, programs, devices, methods, drawings, processes, financial data, financial plans, product plans, passwords, or lists of actual or potential customers or suppliers. This information is that which Brow Art 23 (i) derives (actual or potential) economic value or that through which other persons can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

b)    In this Agreement, "Confidential Information" is technical and non-technical information used in or related to Brow Art 23's business that is not commonly known by or available to the public, including, without limitation, Trade Secrets and information contained in any employee manual, training guides and materials, banking information, customer lists, leasing information, rental space information, and franchising information. In addition, any other information identified as confidential when delivered by Brow Art 23 to Employee shall be deemed Confidential Information . . . .

c)    Any information expressly designed by Brow Art 23 as "Trade Secrets" or "Confidential Information" shall be deemed such for all purposes of this Agreement, but the absence of designation shall not relieve Employee of his or her obligations hereunder in respect of information otherwise constituting Trade Secrets or Confidential Information. Employee understands that Brow Art 23 is providing access to its Trade Secrets and other Confidential Information, which creates a relationship of confidence and trust between Employee and Brow Art 23 with respect to the Trade Secrets and other Confidential Information.

3

Case 2:23-cv-11434-LVP-KGA   ECF No. 13, PageID.950   Filed 07/20/23   Page 4 of 27

(ECF No. 1-1 ¶ 1, Pg ID 51; ECF No. 1-2 ¶ 1, Pg ID 57; ECF No. 1-3 ¶ 1, Pg ID

63.)  Paragraph 2 of the Agreements, titled Confidentiality/Non-Disclosure,"

states:

> a) Employee shall not communicate or divulge to (or use for
> the benefit of) any other person, firm, association, or
> corporation, with the sole exception of Brow Art 23, now
> or at any time in the future, any Trade Secrets or other
> Confidential Information. At any time from the date of this
> Agreement, Employee must take all steps reasonably
> necessary and/or requested by Brow Art 23 to ensure that
> the Confidential Information and Trade Secrets are kept
> confidential pursuant to the terms of this Agreement.
> Employee must comply with all applicable policies,
> procedures and practices that Brow Art 23 has established
> and may establish from time to time with regard to the
> Confidential Information and Trade Secrets.
>
> b) Employee's obligations in paragraph 2(a) above shall
> continue after Employee is no longer employed by Brow
> Art 23, regardless of the reason or reasons for termination,
> and whether such termination is voluntary or involuntary,
> and Brow Art 23 is entitled to communicate Employee's
> obligations under this Agreement to any future customer
> or employer to the extent deemed necessary by Brow Art
> 23 for protection of its rights hereunder and regardless of
> whether Employee or any of its affiliates or assigns
> becomes an investor, partner, joint venturer, broker,
> distributor, or the like in any similarly competitive
> business.

(ECF No. 1-1 ¶ 2, Pg ID 51–52; ECF No. 1-2 ¶ 2, Pg ID 57–58; ECF No. 1-3 ¶ 2,

Pg ID 63–64.)  Paragraph 3, titled "Non-Competition," states:

> a) During the term of Employee's relationship with Brow Art
> 23 and for a period of eighteen (18) months after
> Employee is no longer employed by Brow Art 23,

4

regardless of the cause of expiration or termination, Employee shall not, directly or indirectly, for themselves or through, on behalf of or in conjunction with, any person, persons, partnership, corporation, limited liability company or other business entity, divert or attempt to divert any business or customer of Brow Art 23 to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to Brow Art 23 or its trademark "Brow Art 23" and such other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, drawings and other commercial symbols as Brow Art 23 designates to be used in connection with Brow Art 23's business.

b) During the term of Employee's relationship with Brow Art 23 and for a period of eighteen (18) months thereafter, regardless of the cause of termination, Employee shall not, directly or indirectly, for themselves or through, on behalf of or in conjunction with, any person, persons, partnership, corporation, limited liability company or other business entity, carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business within a twenty-five (25) miles radius of any location where Brow Art 23 conducts or operates its business without express written consent of Brow Art 23.

c) During the term of Employee's relationship with Brow Art 23 and for a period of eighteen (18) months thereafter, regardless of the cause of termination, Employee shall not, directly or indirectly, solicit or otherwise attempt to induce or influence any employee or other business associate of Brow Art 23 to compete against, or terminate or modify his, her or its employment or business relationship with, Brow Art 23.

(ECF No. 1-1 ¶ 3, Pg ID 52; ECF No. 1-2 ¶ 3, Pg ID 58; ECF No. 1-3 ¶ 2, Pg ID 64.)

5

<u>Oakland Mall Location</u>

On April 30, 2013, Perfect Brow Oakland, Inc., ("PBO") which is an affiliate of PBF and PBA, entered into a lease agreement to lease a kiosk located in Oakland Mall at 412 W. 14 Mile Road, Troy, MI 48083.  Upon execution of the Agreements, Defendant Employees began working at this location.

<u>Asset Purchase Agreement</u>

On July 30, 2019, Plaintiff entered into an Asset Purchase Agreement ("Purchase Agreement") with PBA, PBF, PBO, and other affiliates ("Seller Entities").  (Ex. 4, ECF No. 1-4.)  Pursuant to the Purchase Agreement, Plaintiff purchased all of the rights, title, and interest in the Seller Entities' assets.[1] According to Plaintiff, the purchased assets included "all of the Seller Entities' customer records and ***certain assumed contracts and leases***, including without limitation, the Oakland Lease for the Oakland Kiosk Location."  (ECF No. 1 ¶ 36, Pg ID 15 (emphasis added); ECF No. 1-6 at Pg ID 97.)  On September 10, 2019, the U.S. Bankruptcy Court for the Northern District of Illinois entered an order approving the Purchase Agreement between Plaintiff and Seller Entities.  (ECF No. 1-6 at Pg ID 68–83.)

---

[1] Parties dispute whether Plaintiff is currently considered a successor of the previous company under the Purchase Agreement or whether Plaintiff only purchased "certain" assets.  Although this distinction will be relevant in the course of litigation, the Court will not make any fact determinations on this issue here.

## Defendants' Alleged Violations

In September of 2019, Plaintiff assumed the Oakland Kiosk location
pursuant to terms of the Purchase Agreement that included the Oakland Lease
Agreement, which was set to expire on May 31, 2023. Defendant Employees
remained employed with Plaintiff. On March 12, 2023, Neha D. Matiwala, a
Regional Manager for Plaintiff, checked the video camera footage of the Oakland
Kiosk location from March 11. Ms. Matiwala noticed a man who was later
identified as Mario Kiezi—the Owner of Oakland Mall—speaking with Defendant
Employees and showing them images from his phone. After a conference between
Defendant Employees, along with Ms. Matiwala, Khalida Safi, Plaintiff's Director
of Operations, Brijesh Patel, Plaintiff's Owner, and Vinesh Darji, Plaintiff's CEO
(collectively, "Plaintiff's Management"), it was revealed that Mr. Kiezi informed
Defendant Employees that he wanted them to provide eyebrow threading services
at a store that would soon open within the mall.

On April 18, 2023, Defendant Employees and Plaintiff's Management held
another conference where Defendant Employees were notified that the Oakland
Kiosk Location would close on May 31, 2023, and that Oakland Mall decided to
not renew Plaintiff's lease. Additionally, Plaintiff's Management notified
Defendant Employees that Plaintiff planned to open a new location within a three-
minute walk from Oakland Mall at 510 West 14 Mile Road, Troy, MI. Defendant

7

Employees also received a picture of the new location, ECF No. 1-8, and flyers to distribute to customers notifying them of the move.  (ECF No. 1-9.)  Defendant Hirmuz and Defendant Sullaka walked to view Plaintiff's new location.

On May 16, 2023, Plaintiff's Management held another conference with Defendant Employees.  Defendant Hassan notified Plaintiff that she could not work for Plaintiff after May 31, 2023, because she would be traveling out of the country and spending time with her family.  Defendant Hirmuz notified Plaintiff that she would not work for Plaintiff after May 31, 2023, without providing an explanation.  Defendant Sullaka notified Plaintiff that she could not work for Plaintiff after May 31, 2023, because she was hired by a clothing store in Oakland Mall.  Although Plaintiff offered to increase Defendant Employees' compensation, they declined to continue their employment with Plaintiff.

On May 20, 2023, Abdul Al Saeed, Regional Manager for Plaintiff, visited Oakland Mall and "recruited three (3) customers to engage in surveillance of services of Defendant Employees at the Oakland Kiosk Location."  (ECF No. 3 at Pg ID 269.)  During the customers' appointments, Defendant Employees conveyed that Plaintiff would be closing its Oakland Mall location, but a new threading company would be opening nearby inside of the mall.  Defendant Employees also conveyed that the customers should go to the new eyebrow threading company inside the mall, and that Defendant Employees would service them at the new

8

business.  On May 27, Defendants Hirmuz and Sullaka quit working for Plaintiff, followed by Defendant Hassan on May 29.

On June 1, 2023, Mr. Saeed noticed a sign at the entrance of Oakland mall advertising a competitor in the eyebrow threading business, SAAS Brow, which is owned by Defendant Idol Eyes Franchise, LLC, and Defendant Elizabeth Porikos-Gorgees (collectively, "Defendants").  On June 2, 2023, Ms. Safi visited SAAS Brow's Oakland Mall location.  Upon entry, she observed the following:

> (i) a brown brow cake, which was the same as used by Brow Art at is Oakland Kiosk Location, and, on the top of the brown brow cake, where Brow Art's name would normally appear, was written 'SAAS;' (ii) green and blue thread that Brow Art used at its Oakland Kiosk Location, which was clearly pre-used; and (iii) threading tools, accessories and skincare products that were exactly the same as those used by Brow Art at its Oakland Kiosk Location.

(ECF No. 3 at Pg ID 271.)  Shortly after, Defendant Hirmuz appeared from the background followed by Defendant Hassan.  On June 3, an employee at the SAAS Oakland location, Aptasam, —sister of Defendant Sullaka—confirmed that Defendant Sullaka was also employed by SAAS.

On June 5, 2023, Plaintiff's counsel sent letters to Defendant Employees, *see* ECF No. 1-14, notifying them of the alleged violations of their "fiduciary duties and contractual obligations," and demanding that they "cease and desist their violations."  (*Id.*)  On the same day, Plaintiff's counsel also forwarded letters to

9

Defendant SAAS and Defendant Porikos-Gorgees "notifying [Porikos-Gorgees] of Defendants' tortious conduct, reminding [Porikos-Gorgees] of Defendant Employees' fiduciary duties and contractual obligations to Brow Art and demanding that EPG and SAAS cease and desist their tortious conduct." (*Id.* at Pg ID 271–72.)  None of the Defendants responded to the letters.  On June 15, 2023, Plaintiff's counsel followed up with emails to Defendant Employees.

On June 16, 2023, Plaintiff filed the instant lawsuit.  In the Complaint, Plaintiff alleges the following claims: breach of contract (Count I); injunction (Count II); tortious interference with a prospective business advantage (Count III); tortious interference with contracts (Count IV); breach of fiduciary duty (Count V); unjust enrichment (Count VI); civil conspiracy (Count VII); and declaratory judgment (Count VIII).  (ECF No. 1.)

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

Federal Rule of Civil Procedure 65 grants district courts the power to issue an *ex parte* temporary restraining order to maintain the status quo until the court has the opportunity to hold a hearing and decide whether a preliminary injunction should issue.  *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974)).  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the

10

circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

The court considers the following factors when deciding whether to issue injunctive relief: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Id.* (citations omitted). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id*. (citations omitted). Although the court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000). Thus, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## ANALYSIS

### *LIKELIHOOD OF SUCCESS ON THE MERITS*

Plaintiff seeks the entry of a TRO and preliminary injunction "prohibiting Defendant Employees from continuing to violate their fiduciary duties and the Employment Agreements and Defendants from continuing their unlawful actions,

11

including without limitation, their tortious interference with Brow Art's client

goodwill and the Employment Agreements."  (ECF No. 3 at Pg ID 274.)

Specifically, Plaintiff requests the following injunctive relief against Defendants

and Defendant Employees:

> a. Participating in the solicitation of Brow Art's customers, and using confidential and proprietary information of Brow Art, that Defendant Employees gained through their employment with Brow Art, to the benefit of Defendants, particularly the misappropriation of Brow Art's customers;
>
> b. Acting in combination and concert in communicating or divulging, or using for the benefit of themselves or others, trade secrets and confidential information Defendant Employees obtained during their employment with Brow Art, including Brow Art's trade secrets and proprietary and confidential Brow Art information, including customer information;
>
> c. Directly, or indirectly, for themselves or in combination, diverting, or attempting to divert, business and customers of Brow Art to Defendants; and
>
> d. Directly, or indirectly, for themselves or in combination, being employed by, or engaging or rendering services to, SAAS and EPG at SAAS's location in the Oakland Mall, which is within a twenty-five (25) mile radius of Brow Art's location at 510 West Fourteen Mile Road, Troy, Michigan 48083.

(ECF No. 3 ¶ 5, Pg ID 235-54.)  "In order to establish a likelihood of success on

the merits, the movant must generally show that there is a 'strong or substantial'

probability of success."  *Great Lakes Home Health Servs. Inc. v. Crissman*, No.

15-CV-11053, 2015 WL 6667772, at *3 (E.D. Mich. Nov. 2, 2015) (citing *In re DeLorean Motor Co.*, 755 F.2d at 1229).  However, a court may also issue injunctive relief if the movant, at the very least, "demonstrates 'serious questions going to the merits[,] and irreparable harm which decidedly outweighs any potential harm to the [non-movant] if an injunction is issued.' "  *Id.*

A. Breach of Contract (Count I)

The party asserting breach of contract must demonstrate, by a preponderance of the evidence, that: (1) there was a contract between the parties, (2) a breach of its terms by the other party, and (3) damages resulting to the party claiming the breach.  *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).  Plaintiff maintains that Defendant Employees are in breach of the nondisclosure, non-competition, and confidentiality provisions of the Employment Agreements.  Specifically, Plaintiff alleges that it had a valid restrictive covenant in the Employment Agreements, which prevented Defendant Employees from "misappropriating its customers and trade secrets and confidential information" for Defendant Employees' own benefits.

On its face, it does appear that Defendant Employees may have been in clear breach of such covenants.  For example, when Defendant Employees developed business relationships with customers and directed them to SAAS (a direct competitor) and potentially used Plaintiff's "specially designed operations and

13

equipment" at the SAAS location (i.e. brown brow cakes, threads, and signage),

ECF No. 3 at Pg ID 271, and obtained employment by a competitor (SAAS) within

twenty-five miles of Plaintiff despite the provisions prohibiting such conduct.

(ECF No. 1-1 ¶ 2, Pg ID 51–52; ECF No. 1-2 ¶ 2, Pg ID 57–58; ECF No. 1-3 ¶ 2,

Pg ID 63–64.)

However, according to Defendants, there is no enforceable restrictive

covenant between Plaintiff and Defendant Employees.  Defendants allege that

"Plaintiff did not purchase the restrictive covenant agreements at issue here and the

Asset Purchase Agreement specifically states that the Plaintiff, could, but was not

required, to hire the Former Employee Defendants."  (ECF No. 7 at Pg ID 669.)

Defendants maintain that Plaintiff only purchased the enumerated assets of Brow

Art 23 specified in the Purchase Agreement.  Section 1.2 under the Purchase

Agreement describes everything that was transferred to Plaintiff as "Purchased

Assets," and Section 1.3 titled "Excluded Assets" states that only the identified

Purchased Assets were conveyed "and no other assets, properties, rights, contracts

or leases of Seller" were subject to the agreement.  (ECF No. 1-4 at Pg ID 86–87.)

First, Section 1.2 does not explicitly list any restrictive covenants, although

it does list "the Assumed Contracts and Leases, to the extent assigned to Buyer in

accordance with the procedures set forth in this Purchase Agreement."  (Section

1.2(d), *Id.* at Pg ID 86.)  Section 1.3 states: "Excluded Assets. ***Buyer Shall***

14

*purchase and acquire only the Purchased Assets*, and no other assets, properties, rights, contracts or leases of Seller." (*Id.* at Pg ID 87 (emphasis added).) Schedule 1.3 of the Purchase Agreement identifies the "Excluded Assets," which includes "*All Contracts and Leases that are not Assumed Contracts* and Leases and equipment and Intellectual Property subject to Contracts that are not Assumed Contracts;" and excludes "Any asset not constituting a Purchased Asset." (*Id.* at Pg ID 114 (emphasis added).) Section 1.4, which is titled "Assumption of Certain Contracts and Leases and Designations Rights," states that "Schedule 1.4(b) sets forth a list of (i) Contracts, including Franchise Agreements, listed on Schedule 1.4(a) for assumption and assignment to Buyer, effective on and as of the Closing (such Contracts, the 'Assumed Contracts')…." Importantly, Schedule 1.4(b) lists a plethora of lease agreements, sublease agreements, and merchant agreements, that are to be assumed by Plaintiff but fails to list any restrictive covenants. (ECF No. 1-4 at Pg ID 116-129.)

Next, Defendant argues that Section 8.4, titled "Employees," explains that Brow Art 23's employees were not among the Purchased Assets in the Purchase Agreement and that there was no guarantee of continued employment. Section 8.4 states the following:

> Employees. ***Buyer shall have the right, but shall have no obligation***, ***to offer employment post-Closing to employees of Seller***, on substantially the same terms as such employees are employed by Seller. Any meeting

15

> between any such Person and Buyer pursuant to this
> subsection shall occur after the Auction and at a time and
> place that does not conflict with such Person's
> employment obligations to Seller.

(*Id.* at Pg ID 96 (emphasis added).)  Finally, Section 14.6 of the Purchase

Agreement contains the following integration clause regarding the terms of the

contract:

> Entire Agreement: Binding Effect.  This Purchase
> Agreement (together with the Schedules, and the other
> agreements, documents and instruments executed at the
> Closing) sets forth the entire integrated understanding and
> agreement of the Parties with respect to the subject matter
> hereof and supersedes all prior agreements,
> representations, understandings and other
> communications, whether written or verbal, with respect
> to the subject matter hereof. This Purchase Agreement
> may not be modified, amended or terminated except in a
> writing signed by all of the Parties.

(*Id.* at Pg ID 105.)

To summarize, the Purchase Agreement provides a list of what contracts are

assumed by Plaintiff, which does not appear to include the restrictive covenants[2]

(Employment Agreements).  Further, the integration clause makes it clear that the

terms are unambiguous and are meant to be the entirety of the contract; it is fully

---

[2] Plaintiff spends a considerable amount of time developing arguments as to why
the restrictive covenants are reasonable.  However, Defendants focus on the fact
that it is likely that no restrictive covenant was transferred.  Because the Court is
persuaded by Defendants' interpretation of the contract, it need not address any
additional arguments on this issue.

integrated.  Under Illinois law,[3] "if the contract is integrated, parol evidence is not admissible for the purpose of showing that a facially unambiguous provision contains a latent ambiguity." *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015) (applying Illinois law).  As such, the likelihood of success on the merits regarding Plaintiff's breach of contract claim weighs heavily against injunctive relief.

### B.  Tortious Interference with a Contract (Count IV)

"In Michigan, tortious interference with contract requires '(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant.' " *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Loc. 150, AFL-CIO*, 3 F.4th 866, 873–74 (6th Cir. 2021) (quoting *Health Call of Detroit*, 706 N.W.2d at 848–49).  Here, Plaintiff alleges that Defendants (SAAS and Porikos-Gorgees) knowingly induced its employees to breach their employment agreement, which is evidence of its tortious interference with a contract claim.  Because there appears to be no valid restrictive covenants between

---

[3] The Purchase Agreement is subject to Illinois law according to Section 14.9, which states: "This Purchase Agreement is being made in and shall be governed by and construed and enforced in accordance with the laws of the State of Illinois." Michigan has adopted the Restatement (Second) of Conflicts of Laws, *see Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993), and the Court is satisfied that this choice of law provision is valid.  *See e.g., Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999).

17

Plaintiff and Defendants, the likelihood of success on this claim weighs in favor of denying injunctive relief.

C. Tortious Interference with a Prospective Business Advantage (Relationship or Expectancy) (Count III)

Under Michigan law, to prevail on a claim of a tortious interference with a business relationship or expectancy, a plaintiff must prove the following:

> (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Courser v. Allard*, 969 F.3d 604, 620–21 (6th Cir. 2020) (citing *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005). Moreover, "[o]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Adamo Demolition Co.*, 3 F.4th at 874 (quoting *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 157–58 (Mich. Ct. App. 2004); *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002). "A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any

circumstances." *Id.* (quoting *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. Ct. App. 1992).

Although the argument is not clearly presented in the instant motion, Plaintiff does allege the argument in its Complaint.  According to Plaintiff, Defendant Employees "intentionally and maliciously interfered with [Plaintiff's] prospective business advantage by, *inter alia*, maliciously and in bad faith providing to Porikos-Gorgees and SAAS, [Plaintiff's] confidential and proprietary information that the Subject Individuals gained during their employment with [Plaintiff] to, *inter alia*, steal [Plaintiff's] customers and damage [Plaintiff's] client goodwill."  (ECF No. 1 ¶ 153, Pg ID 38–39.)  Regarding whether Defendant Employees provided any confidential or proprietary information to Defendant SAAS or Defendant Porikos-Gorgees, Plaintiff directs the Court to numerous business similarities used by SAAS, including the brow cakes, displays, similarly colored thread, and tools that may have been used when Defendant Employees worked for Plaintiff.  Although potentially concerning, this information provides no weight to the likelihood of success on the merits for a tortious interference claim.[4]  However, this is not the case for the allegation that Defendant Employees attempted to "steal" customers.

---

[4] This argument would have been properly pled under a claim of breach of contract or possibly a violation of Trade Secrets.  It is irrelevant to a tortious interference claim.

To satisfy the element of a "valid business expectancy," a plaintiff must show that they had more than a "subjective expectation of entering into a [business] relationship." *See Compuware Corp. v. IBM*, 259 F. Supp. 2d 597, 604 (E.D. Mich. 2002) (citing *Grand Rapids Plastics, Inc. v. Lakian*, No. 96-CV-73615DT, 1997 WL 33488307, at *12 (E.D. Mich. Nov. 14, 1997), *aff'd,* 188 F.3d 401 (6th Cir. 1999) ("The expectancy must be a reasonable likelihood or probability, not mere wishful thinking.")).  First, Plaintiff alleges that Defendant had access to customer lists and information and may potentially be using the information to obtain clients.  Next, Plaintiff, through an affidavit by Mr. Saeed, *see* ECF No. 3-8 ¶¶ 27–34, alleges that he asked customers to obtain eyebrow services by Defendant Employees and record the interaction.  At such time, Defendant Employees notified the customers that Plaintiff's business would be closing at the Oakland Kiosk Location but that a new business offering eyebrow threading services (SAAS) would be opening up the following month. Importantly, Employee Defendants then allegedly conveyed that they would be working at SAAS and that Defendant Employees would service the customers at SAAS.  At the motion hearing, parties disputed whether Defendant Employees offered the information about relocating to SAAS or whether customers inquired about their employment with SAAS.  For purposes of this motion, the Court will not make any determinations on this issue.  The facts, along with any evidence

20

from future discovery, could likely demonstrate that (1) not only did the customers have a business relationship with Plaintiff, but (2) Defendant Employees knew about the relationship, (3) may have intentionally induced the customers to terminate the relationship and get services at SAAS, which (4) resulted likely in financial damages or damage to customer relationships/business expectancies. As such, Plaintiff has a likelihood of success on the merits for a tortious interference with a business advantage claim. This factor weighs in favor of injunctive relief.

### D. Remaining Claims

For the majority of the remaining claims, Plaintiff does not attempt to develop any arguments. (*See* ECF No. 3 at Pg ID 384–85 ("These same facts also establish that Brow Art is substantially likely that Brow Art will succeed on the merits of its claims for injunction (Count II) . . .  unjust enrichment (Count VI), civil conspiracy (Count VII) and declaratory judgment (Count VIII)").)  Plaintiff merely leaves it to the Court to put flesh on the bones of its claims, which it cannot do. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)) ("It is insufficient 'for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.' ").  Moreover, Plaintiff's claim for injunctive relief is a remedy rather than an independent cause of action. *See, e.g., Chungag v. Wells Fargo Bank, N.A.*, 489 F. App'x 820, 826 (6th Cir. 2012); *FCA*

21

*US LLC v. Bullock*, 446 F. Supp. 3d 201, 207 (E.D. Mich. 2020).  Thus, these

claims will not be addressed here and weigh against granting injunctive relief.

Regarding Plaintiff's claim of a breach of fiduciary duty (Count V), Plaintiff

alleges throughout the Complaint and Motion that Defendants are in violation of

their "fiduciary duties and contractual obligations," but fails to make a sufficient

argument as to whether a fiduciary relationship actually existed between Plaintiff

and Defendant Employees.  Plaintiff relies on two cases from the Michigan

Supreme Court and this Court's previous ruling.  *See generally Follmer, Rudzewicz*

*& Co., P.C. v. Kosco*, 362 N.W.2d 676 (1984); *Nedschroef Detroit Corp. v. Bemas*

*Enters. LLC*, 106 F. Supp. 3d 874 (E.D. Mich. 2015).  In *Kosco*, the Michigan

Supreme Court concluded that "[e]ven in the absence of a contract, an employee

has a duty not to use or disclose confidential information acquired in the course of

his employment."  *Kosco*, 362 N.W.2d at 680.  Under Michigan law, this is called

the "duty of loyalty."  *See Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 624

(E.D. Mich. 2005) (quoting *In re Hanson,* 225 B.R. 366, 375 (Bankr. W.D. Mich.

1998)) ("[t]he common law imposes a duty of loyalty on employees, forbidding

them from taking action contrary to the interests of their employers.")

A fiduciary relationship, which is required to be in breach of a fiduciary

duty, typically arises under four circumstances:

> (1) when one person places trust in the faithful integrity of
> another, who as a result gains superiority or influence over

22

the first, (2) when one person assumes control and
responsibility over another, (3) when one person has a
duty to act for or give advice to another on matters falling
within the scope of the relationship, or (4) when there is a
specific relationship that has traditionally been recognized
as involving fiduciary duties, as with a lawyer and a client
or a stockbroker and a customer.

*Calhoun Cnty. v. Blue Cross Blue Shield Michigan*, 824 N.W.2d 202, 213

(Mich. Ct. App. 2012) (citations omitted).  Plaintiff is correct that this Court in

*Nedschroef Detroit Corp.* previously ruled that the defendants in that case owed a

fiduciary duty to the company.  *See* 106 F. Supp. 3d at 882.  However, the facts in

that case are distinguishable.  In *Nedschroef Detroit Corp*, one of the defendants

was a manager and "the highest ranking employee" who had the authority to

supervise other employees for the plaintiff company.  *Id.* at 879.  Although the

second defendant was not a manager with supervisory authority, he "had the

authority to issue quotations, order replacement parts from suppliers, enter into

contracts, and sign checks on behalf of [the plaintiff company]."  *Id.*  Here,

Plaintiff does not assert that Defendant Employees had any such authority.

Plaintiff merely alleges that Defendant Employees "*had access to Brow Art's*

*confidential and proprietary client information; acted on behalf of Brow Art; were*

*the only employees at, and responsible for the on-site operations of, the Oakland*

*Kiosk Location; and directed Brow Art's customers to a location d/b/a SAAS*

*Brow*."  (ECF No. 10 at Pg ID 914 (emphasis in original).)  As described above,

23

such job responsibilities do not create a fiduciary duty, which undercuts the

argument that there was a breach in a fiduciary duty.  Thus, the remaining claims

are not likely to succeed on the merits.

*IRREPARABLE HARM*

"An injury is irreparable if the harm is difficult to calculate."  *RECO Equip.,*

*Inc. v. Jeffrey S. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28,

2021).  A party's harm is "irreparable" when it cannot be adequately compensated

by money damages.  *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d

592, 603 (E.D. Mich. 2008).  "For an injury to constitute irreparable harm, it must

also 'be certain, great, and actual.'"  *Cooper-Standard Auto. Inc. v. Daikin Am.,*

*Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021) (quoting *Lucero v. Detroit Pub.*

*Schs.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001)).  "[L]oss of customer

goodwill" and damage to "competitive position" are harms that are difficult to

calculate.  *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Collins*

*Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2016).  Plaintiff

maintains that it will suffer irreparable damages including its client goodwill and

customer relationships.  This is a viable argument due to evidence that Defendant

Employees potentially re-routed customers to SAAS.  To the extent that Defendant

Employees are currently using any customer lists of Plaintiff's, Plaintiff will also

suffer irreparable damages if this practice continues. This factor weighs in favor of granting injunctive relief.

## BALANCING OF HARMS

Next, the Court must balance the harms that Defendants would face if injunctive relief were granted with the harm that Plaintiff would suffer without enforcement. As the Sixth Circuit noted:

> [T]he purpose of the [balance of harms] test is ... to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir.1982)). Here, Plaintiff maintains that granting injunctive relief would not harm any third parties and that failure to do so would result in the continued loss of its customers. Defendant responds that Defendant Employees will be harmed by "facing the choice of going back to work for Plaintiff, which they do not wish to do, or having to travel over 25 miles away to work for 18 months . . . ." (ECF No. 7 at Pg ID 691.) At the motion hearing, Defendants raised an additional argument that if an injunction was entered it would force Defendant Employees to cease employment with SAAS, and it

25

would go out of business since they are the only individuals employed as threaders. The Court has considered both arguments and finds that because both parties may be harmed by the scope of the requested injunctive relief: Plaintiff may continue to lose customers and Defendant SAAS may be forced to close its business.  Thus, the Court will take this into consideration in fashioning the appropriate injunctive remedy.  *See Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4360286, at *17 (W.D. Ky. June 20, 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) ("[I]njunctive relief should be no more burdensome than necessary to provide complete relief to the plaintiffs.")  This factor weighs in favor of injunctive relief.

### PUBLIC INTEREST

The final factor is "whether the public interest would be served by the issuance of the injunction."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511 F.3d 535, 551 (6th Cir. 2007).  It is in the public interest to prevent the use or disclosure of a former company's proprietary information, including client lists, to promote fair and robust competition.  This factor weighs in favor of granting injunctive relief.

### CONCLUSION

Having weighed the appropriate factors in consideration for injunctive relief, the Court finds that Plaintiff's motion should be granted in part. To the extent that

26

Defendant Employees are in fact utilizing or disclosing any customer lists obtained during their employment with Plaintiff, they are enjoined from doing so. Otherwise, the Court is denying the remaining requested relief in Plaintiff's motion for a TRO or Preliminary injunction.

Accordingly,

**IT IS ORDERED**, that Plaintiff's Ex-Parte Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 3) is **GRANTED IN PART** and **DENIED IN PART**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 20, 2023

27